**AH PAH REDWOOD COMPANY, a corporation, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 15434.

United States Court of Appeals Ninth Circuit.

Dec. 13, 1957.

James C. Dezendorf, Koerner, Young, McColloch & Dezendorf, Marshall C. Cheney, Jr., Portland, Or., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Helen A. Buckley, Robert N. Anderson, Walter R. Gelles, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before BONE and HAMLEY, Circuit Judges, and GOODMAN, District Judge.

HAMLEY, Circuit Judge.

This matter is before us on a taxpayer's petition to review a decision of the Tax Court of the United States. In that decision, reported at 26 T.C. 1197, the tax court upheld a $38,304.21 income tax deficiency determination by the Commissioner of Internal Revenue, covering the calendar years 1948 and 1949.[1]

---

1. Penalty assessments in the amount of twenty-five per cent of this sum were also made, pursuant to 26 U.S.C.A. (I.R.C.1939) § 291, because of the late filing of tax returns for these years.

The propriety of making a penalty assessment in this percentage on the amount of tax properly assessable for these years is not questioned.

In reaching this decision, the tax court held that the petitioner, Ah Pah Redwood Company, was not entitled to treat as long-term capital gains the receipts from the sale of timber cut and removed from its property by Coast Redwood Company between April 1948 and the end of 1949. The correctness of this ruling presents one of the two questions submitted for our consideration.

The facts to be considered in determining this question are undisputed. On December 13, 1946, Sage Land & Lumber Company, Inc., (seller) and Union Bond & Trust Company (buyer) entered into a contract for the sale and purchase of certain timberland situated in Humboldt county, California. In October, 1947, immediately after its organization as a corporation, petitioner purchased all of the right, title, and interest of Union Bond & Trust Company in this contract. Petitioner, according to the stipulated facts, then

"* * * allowed Coast Redwood Co. (an affiliate) to start cutting timber on this tract shortly after purchase and pay $5.00 per thousand feet as removed. This was an oral or implied contract."[2]

Pursuant to this arrangement, Coast began cutting timber on this tract, and, as it did so, paid the stipulated price. This activity continued through the balance of 1947, and throughout 1948 and 1949. On January 9, 1950, petitioner entered into a formal written agreement with Coast, under which the latter company purchased the land and all of the remaining timber covered by the contract of December 13, 1946.

Petitioner considered that its receipts from the sale of timber cut by Coast from April, 1948 (six months after petitioner acquired its interest in the tract and timber) to the end of 1949, were reportable as long-term capital gains. The company so reported these receipts in its income tax reports for 1948 and 1949, and claimed the preferential tax treatment accorded such gains, as prescribed by 26 U.S.C.A. (I.R.C.1939) § 117. All statutory references in this opinion are to the Internal Revenue Code of 1939.

The commissioner held, in his deficiency determination, that these receipts were taxable as ordinary income, instead of capital gains. As before indicated, the tax court concurred in this view.[3]

It seems to have been the position of both parties in the tax court, and initially in this court, that, if petitioner was entitled to capital-gains treatment on these receipts, it must be by reason of that part of § 117(j)[4] which gives application to transactions of the kind described in subsection (k) (2) of the same section. Both respondent and petitioner, therefore, originally turned their attention primarily to subsection (k) (2), the pertinent part of which reads as follows:

"(2) In the case of the disposal of timber or coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal. * * *"

Petitioner contended that contracts of "disposal," within the meaning of subsection (k) (2), were entered into as and

---

2. The record contains no other information concerning this arrangement between petitioner and Coast.

3. Judge Murdock dissented.

4. Section 117(j) (1) provides, in part, that the term "property used in the trade or business" includes "timber or coal with respect to which subsection (k) (1) or (2) is applicable * * *" Section 117(j) (2) provides, in part, that if, during the taxable year, the recognized gains upon sales of property used in the trade or business exceed the recognized losses from such sales, "such gains * * shall be considered as gains * * * from sales * * * of capital assets held for more than 6 months. * * *"

when the timber was cut and paid for. All receipts from timber cut and paid for more than six months after petitioner obtained its interest in the tract could therefore, according to petitioner, be treated as capital gains. Respondent, on the other hand, argued that the cutting and payment transactions could not be regarded as contracts of "disposal," within the meaning of subsection (k) (2), because all such timber had already been disposed of by the act of the parties in entering into the October 1947 arrangement described in the above-quoted stipulation.

Both parties recognized that the October 1947 arrangement could not itself qualify as a transaction of the kind described in subsection (k) (2), since it was entered into within six months of the time petitioner acquired its interest in the timber.

The tax court, apparently accepting the issues as tendered by the parties, adopted respondent's view that the October 1947 arrangement between petitioner and Coast represented a "disposal" of the timber thereafter cut, so that the later acts of cutting and paying for such timber could not be considered transactions of the kind described in subsection (k) (2). But the tax court, still directing attention to subsection (k) (2), also advanced another reason for holding against petitioner—a reason which was not urged upon it by respondent. This was that subsection (k) (2) is not applicable in the case of property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, citing § 117(j) (1).[5]

On appeal, respondent completely disavowed this second reason advanced by the tax court, and pointed to an official ruling to the effect that the tax court decision, in this respect, does not represent the position of the Internal Revenue Service.[6] The result was that, in their initial arguments in this court, both respondent and petitioner took the position, as they had in the tax court, that the controlling issue was whether the "disposal" of timber took place as and when the timber was cut and paid for, in which event subsection (k) (2) would apply, or at the time of the October 1947 arrangement, in which case subsection (k) (2) would not apply, and petitioner would not be entitled to capital-gains treatment.

Petitioner argued that the October 1947 arrangement, being only a license to cut, coupled with an offer to sell cut timber, and unsupported by consideration, is noncontractual, and therefore not a disposal "under any form or type of contract," which is a requirement of subsection (k) (2). It also contended that, even if it be assumed that the October 1947 arrangement is contractual, since it is not in writing it is not binding upon petitioner but is revocable at any time. This being the case, petitioner urged, the arrangement under discussion cannot be considered a "disposal" of timber, within the meaning of subsection (k) (2). Hence, petitioner reasoned, since the October 1947 arrangement was not a "disposal" under subsection (k) (2), the later cutting and payment transactions

---

5. The tax court made no finding of fact, as such, concerning the taxpayer's purpose in holding this timber. In its opinion, however, the court said:

"* * * In this connection, respondent makes the point, which we feel to be well taken, that petitioner at no time engaged in any logging activities, but, rather, merely sold the Sage timber to others under arrangements whereby the vendees would do the logging; that these sales of timber were the only business activity entered into by petitioner; that it is thus to be considered as having been engaged in the trade or business of selling timber; and that the timber in dispute, whether or not it was standing, was held for sale to customers in the ordinary course of such business."

6. See Rev.Rul. 57–90, 1957–10 Int.Rev. Bull. 9. Our reading of the statute accords with the view expressed in this ruling. A taxpayer is entitled to capital-gains treatment of income derived from the disposal of timber under § 117(k) (2), without regard to the purpose for which the timber was held, provided the taxpayer satisfies the other requirements set forth in the cited statutes.

stand undefeated as subsection (k) (2) "disposals."

Respondent, on the other hand, contended that the arrangement of October 1947 was contractual in nature, because the stipulation of facts, quoted above, said it was. Although the October 1947 arrangement was oral, and therefore perhaps revocable under the statute of frauds, respondent pointed out that it was not revoked. Respondent further argued that, while the arrangement in question may have been only a cutting license and not a sale, it was nevertheless a "disposal," within the meaning of subsection (k) (2), citing Springfield Plywood Corporation v. Commissioner, 15 T. C. 697. Thus, respondent concluded, there was a "disposal" of all of the timber in October 1947, and hence there could be no later "disposal" of the same timber.

A new contention, however, was injected into the case when respondent filed its first supplemental brief, responding to appellant's reply brief. Respondent then contended, for the first time, that if, as petitioner argued, the sales or disposals occurred as the timber was cut and paid for, the transactions involved no retention by the owner of an economic interest in the timber, this being an indispensable requirement under subsection (k) (2).

■ In our view, the stipulated facts concerning the arrangement between petitioner and Coast, quoted above, indicate that no contract was entered into in October 1947. Under that arrangement, petitioner "allowed" Coast to "start cutting timber" and "pay $5.00 per thousand feet as removed." Coast was under no obligation to remove any timber, and accepted no risk with respect to timber not removed. Petitioner received no consideration in any form at the time of the October 1947 arrangement.

In reaching this conclusion, we have not overlooked the concluding words of the quoted stipulation, i. e., "This was an oral or implied contract." In view of the immediately-preceding words of the

stipulation, which plainly indicate that Coast incurred no contractual obligation at that time, it must be assumed that these last-quoted words refer to the entire transaction. This would include not only the license extended and price quoted in October 1947, but also Coast's use of the license and acceptance of the offer by cutting and paying for the timber.

Assuming, as said in Springfield Plywood Corp. v. Commissioner, supra, that a cutting license can be a "disposal" under subsection (k) (2), it still must be a contractual disposal to meet the requirements of subsection (k) (2). In the Springfield case, the transaction, whether considered a sale or a license, was concededly evidenced by a contract between the owner and the cutter. That is not true here. It follows, therefore, that the October 1947 arrangement was not a "disposal," within the meaning of subsection (k) (2), and does not stand in the way of characterizing the later cutting and payment transactions as such "disposals."

■ We also hold, however, that these later cutting and payment transactions, which occurred between April 1948 and the end of 1949, were not within subsection (k) (2), because they did not represent disposals in connection with which the owner retained an economic interest in such timber. This, as before noted, is an indispensable requirement of subsection (k) (2).

If this were the only statutory provision under which the seller of timber could claim capital-gains treatment, the ruling just announced would be conclusive on this phase of the case. Capital-gains treatment is not available to this petitioner under subsection (k) (2).

Noting that the parties, up to and including the filing of first supplemental briefs, seemed to be preoccupied with subsection (k) (2) as a basis for capital-gains treatment, we requested them to submit second supplemental briefs. They were asked to discuss the question of whether capital-gains treatment in the sale of timber is attainable only where

the timber is disposed of under a contract by virtue of which the owner retains an economic interest (as provided in subsection (k) (2)), or whether capital-gains treatment is also available under some other statutory provision where timber is disposed of without retention of an economic interest.

In their second supplemental briefs, both parties call attention to the fact that capital-gains treatment is available for absolute sales of timber (no economic interest being retained) under either subsection (a) (1) or (j) (1) of § 117, provided that the six-month-holding-period requirement is met, and that the timber was not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

Respondent argues, however, that individual cutting and payment transactions between petitioner and Coast after April 1948 cannot be dealt with as absolute sales, under either of these subsections, since the tax court had stated in its opinion that the timber was held for sale to customers in the ordinary course of such business.[7] Petitioner, on the other hand, contends that these transactions can be dealt with as absolute sales under these subsections of the statute, because the tax court's statement that the timber was held for sale to customers in the ordinary course of business is not supported by evidence.

In so far as the record and briefs would indicate, therefore, the only thing which may stand in the way of applying one or the other of these last-mentioned subsections is that petitioner may have been holding the timber primarily for sale to customers in the ordinary course of its trade or business. If so, the transactions are excluded under the express terms of subsections (a) (1) and (j) (1).

As before noted, the trial court did not make a finding of fact, as such, on this point. It did, however, make a statement in the course of its opinion, substantially to the effect that the timber was being held primarily for sale to customers in the ordinary course of trade or business.[8]

Respondent and petition are in agreement that there is no evidence in the record to support a finding of fact to this effect.[9] So are we.

■ Under normal circumstances, a taxpayer desiring to take advantage of the subsections now under discussion has the burden of proving that he was not holding the property primarily for sale to customers in the ordinary course of his trade or business.[10] In this case, however, the factual question concerning petitioner's purpose in holding the timber was not pertinent to the issues as they were framed in the tax court. Only subsection (k) (2) was then being relied upon, regarding which the purpose in holding the timber was immaterial. Thus, all concerned failed to appreciate the presence of a factual issue which would have to be decided. Under these circumstances, this should not be regarded as a failure of proof for which petitioner must accept sole responsibility.

■ This presents the further question, however, of whether petitioner is now entitled to rely upon the absolute-sale provisions of subsection (a) (1) or

7. See footnote 5. As before noted, the absolute sale provisions of subsections (a) (1) and (j) (1) are not available to a taxpayer with respect to timber held primarily for sale to customers in the ordinary course of trade or business.

8. This statement was made not for the purpose of passing upon the applicability of the absolute sales provisions of subsections (a) (1) or (j) (1), but in developing its additional and uninvited reason for holding subsection (k) (2) inapplicable.

9. In its brief filed in the tax court, respondent said (page 13): " * * * Nor is there any evidence as to the trade or business of petitioner or the purpose for which the property was being held by petitioner."

10. See Homann v. Commissioner, 9 Cir., 230 F.2d 671, 672; Pacific Homes v. United States, 9 Cir., 230 F.2d 755, 761, concurring opinion.

(j) (1), having relied only upon subsection (k) (2) in the tax court. The general rule is that for points to be passed upon here, they must have been reserved in the lower court. We should not, however, hesitate to exercise the power and duty to notice error to which the attention of the tax court has not been called, where in exceptional cases this is necessary to prevent a miscarriage of justice. See Legg's Estate v. Commissioner, 4 Cir., 114 F.2d 760, 767.

■ The fact that subsection (k) (2) makes express reference to timber disposals, while subsections (a) (1) and (j) (1) do not, may account for the sole and, as it turned out, mistaken reliance which counsel for petitioner placed upon subsection (k) (2) in the tax court proceedings. They would not have done so had they appreciated that a transaction consisting of a sale and immediate payment could not qualify under (k) (2) because it would involve no retention of an economic interest. But respondent seemingly shared this misconception at the outset, for he did not call attention to the point until he filed his first supplemental brief in this court. The "economic interest" provision of subsection (k) (2) thus constituted a mutually unperceived booby-trap which did not come to light until long after the tax court proceedings.

While the circumstance just related may not be sufficiently exceptional to warrant an absolute reversal, we think it sufficiently unique to warrant a remand for further tax court proceedings, if a miscarriage of justice would otherwise result. We have no doubts on the latter score. If petitioner did fully qualify for capital-gains treatment under subsection (a) (1) or (j) (1), there was no $38,304.21 deficiency. Insistence that petitioner pay such a nonexistent "deficiency" (plus the higher penalty assessments associated therewith), because both parties initially cited the wrong subsection of § 117, would, in our opinion, be a miscarriage of justice.

We therefore conclude that the case must be remanded to the tax court for further proceedings and a determination as to whether petitioner was entitled to capital-gains treatment under subsection (a) (1) or (j) (1).

■■ This brings us to the second and last question submitted for our consideration on this review. This is whether petitioner's claimed depletion allowance for the taxable years 1948 and 1949 should be retroactively adjusted in petitioner's favor, where it was discovered, in 1952, that the quantity of timber had originally been overstated in a substantial amount.

In reporting its income for the taxable years 1948 and 1949, petitioner used a basis for depletion of $3.941566 per thousand board feet. Respondent used the same basis in computing a portion of the deficiencies here in question. Both parties computed the basis for depletion by dividing the amount of timber on the Sage tract, as shown on schedule A of the agreement of December 13, 1946, into the total purchase price paid by petitioner for such timber. In 1952, petitioner first realized that schedule A of the Sage agreement erroneously overstated the quantity of timber by a substantial amount. When petitioner made an actual cruise shortly after logging operations ceased in November of 1954, the overstatement was found to be approximately forty-eight per cent.

The applicable statute in effect during the years in question was § 23(m) (26 U.S.C.A.), which is quoted in the margin.[11] The emphasized words in this

---

11. "§ 23.  Deductions from gross income. In computing net income there shall be allowed as deductions:
  *  *  *  *  *
  "(m) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascer-

statute make clear that the relief which petitioner seeks is not available. The commissioner may not apply a depletion rate, based upon a revised estimate, retroactively to tax years prior to the date of revision.[12]

Treasury Regulations 111, § 29.23 (m)–22, relied upon by petitioner, has no reference to the problem before us. That section of the regulations relates to the matter of *revaluation* of the basis of timber property as opposed to a redetermination of the *quantity* of timber, with which § 29.23(m)–26 is concerned. A revaluation changes the total depletion to be allowed over the life existence of the wasting asset. A revision of the number of units, on the other hand, leaves the total depletion allowance intact and merely reallocates the deduction per unit. The last sentence of Treasury Regulations 111, § 29.23(m)–22, itself, refers the taxpayers specifically to § 29.23(m)–26, for the procedure and rules applicable to a revision of the remaining depletive units.

Rust-Owen Lumber Co. v. Commissioner, 7 Cir., 74 F.2d 18, also relied upon by petitioner, likewise deals primarily with revaluation, although the number of units was necessarily considered in determining total aggregate value.

In Beck v. Commissioner, 15 T.C. 642, affirmed 2 Cir., 194 F.2d 537, the taxpayer was aware of facts which would have required a downward revision of the depletion deduction for the years 1938 through 1941, but did not come forward with the facts. Subsequent to the tax years, the commissioner discovered the facts, and proceeded to revise the depletion allowance for the years involved. Sustaining this action, the court held, in effect, that a downward revision in depletion allowance will be deemed to have been made as of the date that the taxpayer ascertains facts requiring a downward revision.

Reading together the cited cases, the rule which emerges is that a retroactive adjustment in the depletion allowance is permissible only where there has been suppression of information by the taxpayer. Neither Beck nor any other decision which has come to our attention stands for the proposition, advanced by petitioner, that, if the taxpayer could have ascertained during the taxable years an error in depletion allowance which is adverse to his interests, his later discovery thereof entitles him to retroactive adjustment in his favor.

We therefore conclude that the tax court did not err in holding that petitioner's depletion allowance for the taxable years 1948 and 1949 is not adjustable to reflect the subsequently discovered underrun of timber on the tract.

The judgment is reversed and the cause is remanded to the tax court for further proceedings not inconsistent with this opinion.

tained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection *for subsequent taxable years* shall be based upon such revised estimate. In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. In the case of property held by one person for life with remainder to another person, the deduction shall be computed as if the life tenant were the absolute owner of the property and shall be allowed to the life tenant. In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each." (Emphasis supplied.)

12. Petit Anse Co. v. Commissioner, 5 Cir., 155 F.2d 797, certiorari denied 329 U.S. 732, 67 S.Ct. 92, 91 L.Ed. 632; McCahill v. Helvering, 8 Cir., 75 F.2d 725. Treasury Regulations 111, § 29.23(m)–26, conforming to the statute, states that, where it is subsequently ascertained that there are more or less units of timber remaining than the original estimate indicates,

" * * * then the original estimate (but not the basis for depletion) shall be revised and the annual depletion allowance with respect to the property *for subsequent taxable years* shall be based upon the revised estimate." (Emphasis supplied.)