ESTATE OF JAMES M. LAWTON, DECEASED, HAYES F. LAWTON, EXECUTRIX, AND HAYES F. LAWTON, SURVIVING WIFE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HAYES F. LAWTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 68444, 68445. Filed October 19, 1959.

*Wilton H. Wallace, Esq.*, and *Henry F. Lerch, Esq.*, for the petitioners.

*James E. Johnson, Jr., Esq.*, for the respondent.

## OPINION.

FISHER, *Judge:* This consolidated proceeding involves deficiencies in income tax determined against petitioners as follows:

| Docket No. | Year | Amount |
|---|---|---|
| 68444 | 1953 | $434.79 |
| 68445 | 1954 | 622.50 |

The principal issue presented for our consideration is whether annual payments in the amount of $4,225.36, received by petitioners in each of the taxable years 1953 and 1954 under the terms of a contract which, among other things, gave Union Bag, the "lessee," the exclusive use and control of petitioners' (lessors') land for timber farming, including the right to cut and remove a fixed amount of pulpwood each year during the life of the contract, are to be accorded capital gains treatment pursuant to sections 117(a) (1) and (4), or 117(j) and 117(k)(2) of the 1939 Code or their counterparts, sections 1221 and 1222(3) or 1231 and 631(b) of the Code of 1954.

All of the facts are stipulated and, together with exhibits, are incorporated herein by reference.

James M. Lawton was engaged in producing and selling pulpwood in and around Soperton, Georgia, at the time of his death on December 19, 1953.

For the taxable year 1953, a joint Federal income tax return was filed with the district director of internal revenue for the district of Georgia, by Hayes F. Lawton and James M. Lawton, deceased.

For the taxable year 1954, a fiduciary return (Form 1041) was filed for the Estate of James M. Lawton with the district director of internal revenue for the district of Georgia showing all the income as having been distributed to Hayes F. Lawton, sole beneficiary. Hayes filed her personal individual tax return for 1954 with the district director of internal revenue for the district of Georgia, and included the total income as shown by the fiduciary return as having been distributed to her.

On September 1, 1952, James M. Lawton, who owned 2,414.49 acres of land in Treutlen County, Georgia, acquired at various dates between January 14, 1943, and February 24, 1952, entered into an agreement (designated as Indenture) with the Union Bag and Paper Corporation, hereafter referred to as Union Bag.

Said agreement wherein James is referred to as "lessor" and Union Bag as "lessee," commences with the recital:

That the LESSOR, for and in consideration of the sum of ONE ($1.00) DOLLAR cash in hand paid, * * * has granted, leased and demised for a period of sixty-six (66) years from and after September 1st, 1952, and by this instrument does grant, lease and demise unto UNION BAG, and UNION BAG has leased from LESSOR for the said period, the following tracts, lands, and premises located in Treutlen County, Georgia: * * *

There then follows the legal description of the various lands located in Treutlen County, Georgia, containing approximately 2,414.49 acres, and a statement setting forth the right of Union Bag to have—

the complete and exclusive use and control of said lands (except as said right may be hereinafter specifically modified) and with all the rights, members, hereditaments and appurtenances thereof, including * * * all timber and trees thereon measuring, attaining, or which may measure during the term of this lease five and one-tenth (5.1″) and up, outside bark to outside bark, six (6″) inches above the average soil line at the base of each tree, the cutting and removal of trees and timber hereunder being limited, however, to the maximum annual cordage hereinafter specified in this lease and to the additional rights granted and conveyed under paragraph 6 hereof, and, in the interest and promotion of good forestry management to cut and remove trees, brushwood, undergrowth, et cetera, below said size where necessary for thinning, fire lanes, rights of way, or where the cutting or removal thereof may be necessary, useful or convenient in the cutting, handling, removing, processing or manufacturing of the timber, trees and other products of said land or in the exercise of any of the

rights granted hereunder; and also all turpentine and naval stores, water, water power, grazing, farming, and hunting rights (save as such rights are modified herein), and also rights of way, ways, privileges and easements in and over said land, together with the exclusive right to locate, build, construct, maintain and operate roads, tram roads, railroads, side tracks, skidders, mills, buildings, wells, mines, shafts, dams, ponds, lakes, factories, houses, buildings, and other structures, machinery, fixtures, appliances and methods whether now in use or hereafter invented; * * *

The agreement provides, *inter alia*, as follows:

1. UNION BAG covenants and agrees to do and perform the following acts as a consideration hereof, to-wit:

(a) To pay the proper governmental body or agency, all taxes assessed against the above described land and premises during the entire term of this lease except estate, inheritance, succession taxes or income taxes assessed against LESSOR. * * *

(b) UNION BAG shall throughout the life of this agreement furnish adequate Forest Management and fire protection to said lands and to the trees and timber thereon in substantial compliance with standard usages and practices currently employed to that end, which practices shall, among other thing, include, when necessary, the cutting and maintenance of fire lands (or roads) and the maintenance of fire warden services and in general so furnish and conduct its services in this regard as to conserve, protect and augment the growing of trees and timber upon said lands, the current practices of UNION BAG at the commencement hereof in this respect being conclusively regarded as adequate.

2. UNION BAG agrees to pay to LESSOR as rental for said lands, which shall be payable in advance on or before the 1st day of September of each year, an annual rental of $1.75 per acre upon 2414.49 acres, which said acreage total is hereby agreed upon and stipulated as being the total in the tracts involved— that is to say, shall pay an annual rental of $4,225.36 throughout the full term of this lease or until the option hereinafter granted should have been exercised by UNION BAG or its assigns.

3. During the term of this lease UNION BAG shall have the right to cut and remove from the lands above described a maximum of 2,100 cords per year of the trees and timber above specified. * * *

4. The right to cut and remove from said tract the said maximum of 2,100 cords per year during the term of this lease shall be cumulative, that is to say, if said maximum allowable each year is not cut in any one year the deficiency may be made up and accumulated in any future year or years to the extent of the maximum permitted for such entire period; * * *

* * * * * * *

6. In addition to its right to cut and remove a maximum cordage of 2,100 cords per year during this lease as hereinabove set forth UNION BAG shall have the right to cut and remove at any time during the existence thereof a total of 3 cords per acre of said described trees and timber from said tracts or portions thereof. The consideration for said additional and extra cordage, aggregating 7243.47 cords, shall be $10.00 per acre on the basis of the stipulated acreage of 2414.49 acres. Prior to the execution of this lease UNION BAG has paid to LESSOR, and LESSOR hereby acknowledges payment of the sum of $24,144.90 in cash, representing full payment and consideration for the additional removal rights granted under this paragraph. The said quantity (7243.47) cords of

standing timber, trees and cordage on the said tract or tracts is hereby conveyed, bargained sold and delivered to UNION BAG, in fee simple.

7. At any time after the expiration of 30 years from the effective date of this lease and during the term thereof UNION BAG shall have the right and option, which hereby granted to it, to purchase the above described lands and reversions or those thereof to which LESSOR has merchantable title, in fee simple from LESSOR, his heirs, executors or assigns, at a purchase price of $40.00 per acre. Notice in writing shall be given by UNION BAG of such intention to LESSOR, his heirs, executors, trustees, assigns or personal representatives who within 90 days after such notice is give and upon payment in cash of the agreed and stipulated purchase price, shall convey merchantable fee simple title to LESSOR, its successors or assigns. * * *

Under paragraph 10 of the agreement, Union Bag acquired a one-half undivided interest in all right, royalties, and rentals, growing out of any oil, gas, or mineral lease entered into during the existence of said agreement.

Under paragraph 20 of said agreement, it is stated:

In the event of damage by fire or by other cause to the trees and timber on the said lands under circumstances whereby there exists a right of recovery against a third party, any claims or action for such loss may be brought by UNION BAG or brought jointly and any recovery or amount received in settlement thereof shall be apportioned between the parties by mutual agreement and as their interests may appear. In the event of a dispute as to the proper apportionment, the same shall be referred to arbitration as hereinafter provided.

During the taxable years 1953 and 1954, Union Bag removed 3,589 and 204 cords of pulpwood respectively from the land covered by the agreement.

During the taxable year 1954, Union Bag planted a total of 130 acres in seedlings on the land covered by said agreement.

*Section 117 (k) (2), I.R.C. 1939 (Section 631 (b), I.R.C. 1954).*

Petitioners contend that the annual payments, each in the amount of $4,225.36, which they received from Union Bag during the taxable years 1953 and 1954, are entitled to capital gains treatment under either section 117(a) or sections 117(j)(1) and 117(k)(2) of the Internal Revenue Code of 1939,[1] and their counterparts, sections 1221,

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

\* \* \* \* \* \* \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income;

\* \* \* \* \* \* \*

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property

1231, or 631(b) of the Code of 1954. Respondent, on the other hand, urges that petitioner and Union Bag entered into a lease of the lands in question to be used for "timber farming" as opposed to a "disposal of timber," and, therefore, that said payments constitute rent, taxable as ordinary income. Essentially, it is respondent's position that the transaction involved herein does not constitute a disposal of timber within the purview of sections 117(k)(2) and 631(b), *supra*, and that, within the meaning of the same sections, no "economic interest" in the timber in question was retained by petitioner under the terms of the Union Bag agreement. With respect to the applicability of sections 117 (a)(1) and (a)(4) or (j)(1), *supra*, respondent argues further that petitioners have failed to establish the existence or sale of any timber during the taxable years involved which would meet the specifications of the contract in excess of the 3 cords per acre or a total of 7,243.47 cords for which they received a lump-sum payment at the time the agreement was executed, which part of the transaction was accorded capital gains treatment by the respondent. For reasons hereinafter stated, we agree with respondent's view.

For convenience of discussion, we will first consider the question of whether petitioners are entitled to the treatment provided for by section 117(k)(2), *supra*, which is applicable to a disposal of timber (held for more than 6 months prior to such disposal by the owner thereof) under any form or type of contract by virtue of which the

---

used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a)(1)(C). Such term also includes timber or coal with respect to which subsection (k) (1) or (2) is applicable and unharvested crops to which paragraph (3) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.

(k) GAIN OR LOSS IN THE CASE OF TIMBER OR COAL.—

\*        \*        \*        \*        \*        \*

(2) In the case of the disposal of timber or coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal. Such owner shall not be entitled to the allowance for percentage depletion provided for in section 114(b)(4) with respect to such coal. \* \* \* The date of disposal of such coal shall be deemed to be the date such coal is mined. In determining the gross income, the adjusted gross income, or the net income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this paragraph. \* \* \*

Note: The corresponding provisions of the Code of 1954 (sections 1221, 1231, and 631(b)), to the extent pertinent herein, are substantially the same.

owner retains an economic interest. Such a contract may include a lease. *Springfield Plywood Corporation*, 15 T.C. 697 (1950).

Section 631(b) of the Code of 1954 is substantially the same as section 117(k)(2) of the 1939 Code, with some modifications not here significant. If these sections apply, the transaction will be considered as though it gave rise to gain or loss, as the case may be, upon the sale of such timber. A clear instance of such disposal of timber with an economic interest retained is where timber is sold on the stump, cut by the vendee, measured after cut, and payment is made to the owner on a per unit cut basis. See *Boeing* v. *United States*, 98 F. Supp. 581 (Ct. Cl. 1951); *L. D. Wilson*, 26 T.C. 474 (1956). Where timber was sold in this manner, prior to the enactment of section 117(k) (added by section 127(a) of the Revenue Act of 1943), the transaction was viewed by the Commissioner as a lease or cutting contract, not as an outright sale of the timber, and receipts of the timber owner were generally taxed as ordinary income. G.C.M. 22730, 1941–1 C.B. 214. See *Burnet* v. *Harmel*, 287 U.S. 103 (1932). This situation was changed by section 117(k)(2), *supra*, which operates to make a qualifying transaction a sale of the timber, gain or loss from which may thereby become eligible under section 117(j) for capital gains treatment.[2]

Section 39.23(m)–1(b), Regulations 118 (which is substantially the same as proposed sec. 1.611–1(b), Income Tax Regs., under the Code of 1954), dealing with an economic interest provides, in part, that:

An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in * * * standing timber and secures, by any form of legal relationship, income derived from the severance and sale of * * * timber, to which he must look for a return of his capital.

In essence, economic interest is the right to share in the proceeds of the natural resources (here timber). Recovery of the capital investment must be conditioned upon severance of the timber. Rev. Rul. 56–542, 1956–2 C.B. 327; G.C.M. 22730, 1941–1 C.B. 214.

Consistent with the aforesaid definition, the courts have held that a reservation of an economic interest in mineral resources exists where

---

[2] The Senate Finance Committee which originally recommended the enactment of section 117(k)(2) of the Code stated, in part, in S. Rept. No. 627, 78th Cong., 1st Sess., pp. 25–26, as follows:

"Your committee is of the opinion that various timber owners are seriously handicapped under the Federal income and excess profits tax laws. The law discriminates against taxpayers who dispose of timber by cutting it as compared with those who sell timber outright. The income realized from the cutting of timber is now taxed as ordinary income at full income and excess profits tax rates and not at capital gain rates. In short, if the taxpayer cuts his own timber he loses the benefit of the capital gain rate which applies when he sells the same timber outright to another. *Similarly, owners who sell their timber on a so-called cutting contract under which the owner retains an economic interest in the property are held to have leased their property and are therefore not accorded under present law capital-gains treatment* of any increase in value realized over the depletion basis." (Emphasis supplied.)

the consideration for the transaction whether payable in cash or in kind, is payable solely out of or contingent upon the proceeds of the natural resource. See *Kirby Petroleum Co.* v. *Commissioner*, 326 U.S. 599 (1945); *Thomas* v. *Perkins*, 301 U.S. 655 (1937); *Easton Coal Corp.* v. *Yoke*, 67 F. Supp. 166 (1946).

See *Lincoln D. Godshall*, 13 T.C. 681 (1948), where we held that the taxpayer had reserved an economic interest in a mining property since the rental payment received under an instrument, styled as a lease, was wholly contingent on what the lessee could or would produce from the mineral property.

The same principal has been applied in the case of timber properties. In *L. D. Wilson, supra*, where the applicability of section 117 (k) (2), *supra*, was involved, we held that under the terms of the contract the members of the partnership retained an economic interest in the timber since it was obliged to look to a severance of the timber for a return of its investment. To the same effect, see *Boeing* v. *United States, supra*.

Where there is no such retention of an economic interest in the timber, however, section 117 (k) (2) does not apply. *Ah Pah Redwood Co.* v. *Commissioner*, 251 F. 2d 163 (C.A. 9, 1957), reversing on another point 26 T.C. 1197 (1956).

The record, which is wholly stipulated, shows that under paragraph 2 of the Union Bag agreement, petitioner was to receive, on or before the first day of September in each year, a fixed annual rental, payable in advance, in the amount of $1.75 per acre upon 2,414.49 acres, or a total of $4,225.36 throughout the full term of the 66-year lease, or until the option to purchase is exercised by the lessee or its assigns pursuant to the terms of said agreement. Rent was to be paid each year regardless whether or not any of the timber involved was cut or removed from petitioner's acreage. As the agreement is explicit in this respect, we think it clear that petitioners have not, in any sense of the term, retained the necessary economic interest in the timber which would entitle them to capital gains treatment pursuant to section 117 (k) (2). See *Ah Pah Redwood Co.* v. *Commissioner, supra*. We have painstakingly examined the entire agreement in a search for some provision or clause reserving an economic interest in the timber, but find no such reservation.

We add for completeness that paragraph 6 of the agreement provided for the outright sale of 7,243.27 cords of timber for $24,144.90 in cash, which was paid at the time the agreement was executed. Said amount was reported by petitioners as long-term capital gain, which treatment was allowed by respondent. This sale, however, was a separate part of the hybrid agreement and has no effect upon the treatment of the annual payments.

Respondent also argues that there is no evidence to show that there was any timber on the property in excess of the cordage (7,243.27) covered by paragraph 6 of the contract which met the specifications set forth in the agreement, i.e., timber measuring $5\frac{1}{10}$ inches and up, outside bark to outside bark, 6 inches above the average soil line at the base of each tree. He urges, therefore, that there is no proof of disposal of timber in excess of that covered in paragraph 6 of the contract (the treatment of which is not in issue), since there is no evidence of the existence of such timber. Petitioner attacks this view as unrealistic and impractical. Whatever may be the equity of respondent's position, petitioners, who bear the burden of proof, must establish all of the elements required by the statute in order to be accorded its remedial benefit. We cannot supply the necessary evidence for petitioners. We discuss the question further, *infra*, but we think it apparent that petitioners have not established the existence of such excess timber, or the amount thereof, if any existed.

*Sections 117(a) and 117(j), I.R.C. 1939 (Sections 1221 and 1231, I.R.C. 1954).*

Petitioners contend further that they, in fact, made an absolute "sale" of a capital asset, i.e., their interest in the timber, standing and to be grown, designated in the Union Bag agreement, and, hence, that the payments in question are taxable as long-term capital gains under sections 117 (a)(1) and (a)(4), or (j)(1) and their counterparts, sections 1221 and 1222(3) or 1231 (a) and (b) of the Codes of 1939 and 1954, respectively. Essentially, it is petitioners' position that, regardless of the language used in the agreement, the true intent of the parties contemplated the "purchase and sale of timber-cutting rights," i.e., Union Bag purchased the right to cut and remove timber, and petitioners in turn were to receive annually a fixed sales price for a definite number of cords and to have their land reforested in accordance with good forest management.

No evidence was offered supporting the contention that the transaction was intended to be a sale (except for the provisions of the contract in relation to the separate transaction in paragraph 6 thereof which is not here in issue), and it does not appear from the instrument itself that the parties intended any legal relationship other than a lease of the lands in question.

We recognize that the proper construction of the Union Bag agreement, as a sale or lease, depends upon a consideration of the substance of the transaction as a whole and not merely its form. See *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 266 (1958). Despite the equivocal phraseology used in some parts of the contract, it is evident from the entire agreement that the parties intended to create a

lessor-lessee relationship, as determined by respondent, or in any event, that petitioners have failed to meet the burden of proving that the agreement is to be treated otherwise. Examination of the terms of the instrument (designated as an indenture) shows that the parties consistently refer to their agreement as a "lease," and to themselves as "lessor" and "lessee," and except for paragraph 6, mentioned hereinabove, the descriptive terminology is basically consonant with a lessor-lessee arrangement. Moreover, the facts in the case are wholly stipulated and as above indicated the record refers to no contemporaneous implementation or expression of intent to the contrary.

Under the facts presented the legal status given to the instrument by the parties cannot be overlooked, for in the absence of any testimony or evidence to the contrary, we may not assume that the parties have given an erroneous denomination to their transaction. *H. R. DeMilt Co.*, 7 B.T.A. 7, 9 (1927). In *Albritton* v. *Commissioner*, 248 F. 2d 49 (C.A. 5, 1957), affirming on this point 24 T.C. 903 (1955), where the Court of Appeals for the Fifth Circuit reviewed certain gravel contracts and determined that they constituted leases rather than sales, the court stated (pp. 482–483):

While the descriptive terminology of the contracts is not controlling, we cannot ignore or go beyond the language adopted by the parties as the memorial of their agreements. * * * We look therefore to the language of the contracts, which is clear and unambiguous, to ascertain the intent of the parties who executed them.

\* \* \* \* \* \* \*

From the quoted language it is apparent that it would be difficult to draft an instrument more completely embodying the language of a typical lease. The parties named themselves "lessor" and "lessee", they called the income "royalty," using the word several times in the instrument; * * *

Viewing the contract in its entirety, in our opinion the payment of $1.75 per acre by Union Bag was in the nature of rent for the right to use and occupy petitioner's acreage for "pinetree farming" and other independent forestry activities, including the right to cut and remove a cumulative maximum of 2,100 cords per annum of pulpwood during the term of the agreement. See *John S. Pankratz*, 22 T.C. 1298 (1954).

Petitioners rely on *Brown Wood Preserving Co.* v. *United States*, (W.D. Ky.) — F. Supp. — on appeal (C.A. 6, 1958), as holding that a lease agreement may also be construed to be a timber-cutting contract or sales agreement. This case is distinguishable upon its facts and establishes no principle helpful to petitioners in the instant case. In *Brown Wood Preserving Co.*, *supra*, the parties entered into a contract in which the lessor taxpayer, received, in consideration of the lease, a percentage of the gross receipts from the sale of turpentine and retained an economic interest in the standing timber. The

issue was whether the "sale of the rights" to cut and remove the turpentine from the timber constituted a "disposal" of the timber within the meaning of section 117(k)(2), *supra*. Holding in favor of the lessor-taxpayer, the court concluded that the capital gains provisions of section 117(j) are applicable, regardless of whether the necessary disposal under section 117(k)(2) is made by a sale or lease agreement, since the term disposal connotes a broader meaning than merely selling. We find no fault with this view, but we think it clear that it is not to be applied in the instant case in which, as we have indicated above, section 117(k)(2), *supra*, is inapplicable because no economic interest in the timber was retained.

In the light of the foregoing, and the record as a whole, we are convinced that the payments involved represented rent for the use of petitioner's timberland and, accordingly, there was no sale or exchange of a capital asset within the meaning of sections 117(a)(1) and (4), or (j)(1), *supra*, or their counterparts of the Code of 1954.

Petitioners, apparently cognizant of the fact that not all of the timber which Union Bag was entitled to cut under the contract was fully grown or in existence during the taxable years, refer to the timber to be cut by Union Bag *in futuro* as a "growing capital asset." If it were necessary to rule on this contention, we would be inclined to the view that the timber in question was more in the nature of growing or immature crops, the proceeds of the sale of which are generally treated as ordinary income. *Edwards* v. *Commissioner*, 217 F. 2d 952 (C.A. 5, 1955), certiorari denied 349 U.S. 905 (1955), affirming per curiam 20 T.C. 615 (1953). Since, however, there was no sale or exchange under section 117(a)(1) and (4) or 117(j)(1), and since section 117(k)(2) is inapplicable, the contention is not helpful to petitioners.

Assuming *arguendo* that petitioners' agreement with Union Bag is to be construed as intending a sale, we still would have no foundation for a holding that the annual payments involved, or any part thereof, should be accorded capital gains treatment under sections 117(a)(1) and (4) or 117(j), *supra*. We recognize that timber may be a capital asset and that the proceeds from its sale may be entitled to capital gains treatment where all statutory requirements are met. It is obvious, however, that to achieve such a result, it would be incumbent upon petitioners to show that something was actually sold and also what were the proceeds attributable to such sale. Thus, in the instant case, it would be necessary to show that there were timber sales to Union Bag in excess of the amounts of timber disposed of in paragraph 6 of the agreement. Moreover, the contract provides for a number of considerations and there is nothing to indicate that the annual payments represented solely consideration for timber. Even if

we assume that such payments were at least partly attributable to the right to cut timber, there is no evidence as to what part is so attributable. In these respects, petitioner has failed to meet his burden of proof.

On the basis of the foregoing discussion, we sustain respondent's determination that petitioners are not entitled to treat the annual payments in question as long-term capital gains.

In view of our holding, we need not consider petitioners' further contention that the valuation placed on the lease agreement for estate tax purposes by the Commissioner in the amount of $76,208.59, should be taken as a basis allocable annually in the amount of $2,627.88 to each annual payment of $4,225.36, for the purpose of computing capital gains on such payment.

*Decisions will be entered under Rule 50.*