Milton **DYAL** et al., Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 21419.

United States Court of Appeals
Fifth Circuit.

March 8, 1965.

Chris B. Conyers, Albert Fendig, and Conyers, Fendig, Dickey & Harris, of Brunswick, Ga., for appellants.

Edward Shillingburg, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Donald H. Fraser, U. S. Atty., Savannah, Ga., Robert N. Anderson, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES and BELL, Circuit Judges, and SPEARS, District Judge.

SPEARS, District Judge:

This is a consolidation of four suits for refund of taxes paid in the years 1956, 1957 and 1958.

The taxpayers reported as capital gain in those years all payments received under three 99-year contracts with the Union Bag & Paper Corporation.[1] The District Director took the position that the payments were ordinary income, and assessed additional taxes thereon. The usual procedures involving the payment of the additional taxes and the filing of claims for refund by the taxpayers having been followed, and the District Director having failed to make the refunds, these suits were instituted.

At a trial with a jury the Court heard evidence from the appellants, after which he directed a verdict in favor of the United States on the ground that the Commissioner had correctly determined that the contracts were in fact leases of land, rendering the annual payments made thereunder ordinary rental income outside the operation of Section 631(b) of the Internal Revenue Code of 1954, and not entitled to capital gain treatment as proceeds from the disposal of timber. This appeal is by the taxpayers from a judgment for the United States.

The following two questions are posed for decision:

(1) Did the evidence authorize the jury to find that taxpayers retained an economic interest in the timber, thereby entitling them to capital gain treatment with respect to the fixed annual payments, under Section 631(b) of the 1954 Code?

(2) Regardless of whether or not taxpayers retained an economic interest in the timber, were they entitled to claim capital gain treatment under Internal Revenue Rulings 62–81 and 62–82, to the extent of the market value of the timber at the time of disposal?

We answer the first question in the negative and the second one in the affirmative.

Taxpayers are the owners of the tracts of land described in the three contracts. Two of them, referred to as the Surrency Leases, are dated December 30, 1941, and the third one, called the Fargo Lease, is dated February 1, 1946. The lands were obtained by Union Bag for the purpose of conducting a tree farming operation and producing crops of pulpwood and timber over the period of 99 years.

Each contract provided that Union Bag should have the complete and exclusive use and control of the lands, including all timber, logging, wood, turpentine and naval stores, oil, mining, mineral, water, water power, grazing, farming and hunting rights, as well as all the rights of way, privileges and easements convenient, useful or necessary in the conduct of Union Bag's business thereon.[2] The habendum clause granted to Union Bag the right to use, work and remove the trees, timber, and other products and deposits thereof, but it was prohibited from cutting any timber on the tracts during the first seven years of the contracts, except for certain purposes.[3] After the first seven years it

1. Hereinafter referred to as Union Bag, the Corporation or the Company.

2. In addition, the contracts granted, leased and demised to the Corporation the exclusive right to locate, build, maintain and operate roads, railroads, mills, building, machinery, fixtures, appliances for use in the Company's business, access over said lands, to transport timber and other products and persons, and the right to cut, use, and remove any timber, trees, fuel, wood, undergrowth, brush, which may be useful, convenient or necessary in the cutting, handling, removing, processing or manufacture of timber, trees, and other products or in exercising any of the rights granted, with the right at any time during the term of the contract to remove any and all machinery, structures and other property of the Company placed on the land; with a clause in the Fargo Lease excepting the removal of stationary and permanent structures and improvements.

3. All of the contracts prohibited Union Bag from cutting, hauling or removing any timber on the tracts during the first seven years, except for saw mill timber

was permitted to cut any timber without charge therefor, not in excess of an agreed-upon annual rate of growth.[4]

Union Bag agreed to pay fixed amounts annually,[5] without regard to the amount of timber cut and removed, the ad valorem taxes assessed during the terms of the contracts, and 5¢ per acre into the Forest Management Fund for fire and forestry protection purposes. Under a supplemental contract granting the owners turpentine rights on the Surrency

tracts only, they agreed to perform all of the forest management functions on those tracts, and in connection with the use thereof they furnished the equipment.[6]

The owners retained the right to cancel each contract and to recover a penalty, in the event of default of any of the terms thereof.[7]

Before discussing the questions presented, a word or two concerning the statutes involved will be in order.

cut, hauled and removed in accordance with the limitations listed, and for buildings and construction, roads, rights of way, fuel wood, protective and scientific thinning purposes. Timber used for pulpwood was to be paid for at market prices to the owners over and above the annual payments. This was to enable existing timber to grow and mature, thus protecting the owners' economic security. The Surrency Leases allowed both the owners and Corporation to cut up to 2,500,000 board feet each per year of saw mill timber during the first seven years, the Corporation to make payments therefor of stated amounts per board foot over and above the yearly payments, such payments to be credited against the option price, if the option is exercised, and the payments for the leased lands to be reduced proportionately. All payments are forfeited to the owner if the option is never exercised. The Fargo Lease had substantially the same provisions but added pulpwood, fuel wood, poles, piling, cross-ties and stumpage to be paid for and credited against the option price under the same conditions provided in the Surrency Leases.

4. Each contract permitted the Company, after the first seven years, to cut, haul and remove timber during the life of the contract without charge therefor over and above the fixed annual payments, in amounts not in excess of an agreed-upon, regularly computed and estimated annual rate of growth on the entire tract since the end of the seven year period, except such as is reasonably required for building and construction, roads, rights of way, fuel wood, protective and scientific thinning purposes; the fuel wood removed for commercial purposes to be paid for at one-half the market price over and above the yearly rental. The right to cut the annual rate of growth was held to be cumulative in Dyal v. Union Bag-Camp Paper Corporation, (5th Cir. 1959) 263 F.2d 387. That the

right is cumulative is specifically provided in the Fargo Lease. Later modifications in an agreement effective as of January 1, 1949, allowed removal of 19,-641.72 cords per year even though this amount should exceed the computed annual growth.

5. The fixed amounts annually equal five percent of the value of the lands agreed upon for this purpose of $15.00 per acre, which value was the amount for which Union Bag could purchase the separate tracts outright, and acquire a title in fee simple, if it so desired.

6. Union Bag was granted the right in each contract, though sharply restricted, at no additional cost over and above the annual rentals, to carry on turpentine and naval stores operations on the lands, or to lease the property to a naval stores operator. In an agreement made in 1946, Union Bag granted to the owners the right of refusal to enter upon the lands to conduct turpentine, timber, naval stores and pulpwood operations. An agreement in 1957 granted to Dyal, as "lessee" for a term of one year, the right to enter upon the lands covered by the Surrency Leases to conduct turpentine operations for no more than 18 crops, for which Dyal was to pay Union Bag by the crop and assume the obligations imposed upon Union Bag under the Surrency Leases pertaining to forest management, protection and maintenance services, and reserving in Union Bag the right to cancel the contract for violation of any provision by Dyal.

7. Other provisions in all of the contracts:
   a) Prohibited Union Bag from clearing any land for farm purposes except by written agreement of lessor as to the Surrency tracts only.
   b) Provided in the Fargo Lease, that the owners and Union Bag, were to share equally any amounts recovered for fire or other damage to the tracts offset by the expenses of

Section 631(b), Int.Rev.Code of 1954, the successor to Section 117(k) (2), Int. Rev.Code of 1939, provides, in part, as follows:

"In the case of the disposal of timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. * * * "

Prior to the enactment of Section 117(k) in 1943, an owner could achieve capital gain treatment with respect to the sale or exchange of timber under either one of two sections of the 1954 Internal Revenue Code. First, under Section 1221 (formerly Section 117(a) (1) of the 1939 Code) if he held an interest in a tract of standing timber as an investment for more than 6 months, and it was neither property used in his trade or business, nor property held primarily for sale to customers in the ordinary course of his trade or business, it would qualify as a capital asset. Second, if the timber was property not held primarily for sale to customers in the ordinary course of the trade or business of the taxpayer, or was not properly includible in his inventory, but was, instead, property used in his trade or business and held for more than six months, the gain on the sale or exchange thereof would qualify for Section 1231 (formerly Section 117(j) (1) and (2) of

the 1939 Code) capital gain treatment. The effect of these two sections was to make capital gain treatment available to an owner with respect to property held by him for investment, or used in his trade or business, provided, in each instance, it is held for more than six months.

Section 117(k) was enacted to alleviate two uncertainties in connection with Section 1231 treatment. In the first place, when the owner cut the timber himself and sold it, he may have been deemed a dealer holding the timber for sale to customers in the ordinary course of business, thus losing the advantage of capital gain treatment. In the second place, where the owner granted the right to cut and remove the timber to another, reserving a royalty interest to himself, the Internal Revenue Service, by analogy to the oil and gas situation,[8] might have accorded ordinary income treatment to the royalties received.

The definition of the term "property used in the trade or business", as contained in Section 1231, was expanded by Section 117(k) to include timber with respect to which Section 117(k) applies, by directing that a cutting of timber, or a disposal thereof with an economic interest retained, shall be considered a sale or exchange within Section 1231. And this is true even though the timber may have been held by the owner primarily for sale to customers in the ordinary course of his trade or business.[9] Whether or not a sale or exchange qualifies for Section 1231 treatment under Section 117(k), it may still qualify under the general provisions of Section 1231 as property used in a trade or busi-

recovery. A similar clause was added to the second Surrency Lease in 1953.

c) Did not provide for division of condemnation proceedings awards, but a 1959 agreement divided the rights to any such awards equally between Union Bag and the owners.

d) Provided in the Fargo Lease, that the owners and Union Bag were to share equally any rentals, royalties and mineral rights earned under

any oil and gas leases covering the Fargo tracts after the expiration of five years from the date of the lease.

8. See Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. (1932); Treas.Reg. § 1.611–1, et seq.; Int.Rev.Code of 1954, Section 61 (a) (6).

9. Treas.Reg. § 1.631–2.

ness, or it may qualify for Section 1221 treatment as a capital asset held for investment purposes.

We disagree with the taxpayers' contention in this case that the evidence authorized the jury to find that they retained an economic interest in the timber, and thereby were entitled to Section 1231 capital gain treatment pursuant to Section 117(k) (2), now Section 631 (b).

Under this section, as we have seen, a disposal by an owner of timber (1) held for more than six months, (2) under any form or type of contract, (3) whereby the owner retains an economic interest in the timber, qualifies as a sale or exchange of such timber pursuant to Section 1231.

■ An economic interest is described as one "in which the taxpayer has acquired by investment any interest in * * * standing timber and secures, by any form of legal relationship, income derived from the * * * severance of the timber, to which he must look for a return of his capital".[10] One without any capital investment in the timber does not possess an economic interest simply because, through a contractual relationship, he has a mere economic or pecuniary advantage derived from its production.[11] It is essential that the consideration for the transaction, whether payable in cash or in kind, be contingent upon the severance of the timber, and payable to the owner solely out of the proceeds from the natural resource itself.[12]

■ Here the taxpayers received under the contracts (a) fixed annual payments equal to a percentage interest of the value of the lands, without regard to the amount of timber cut and removed, but limited to the annual rate of growth after the first seven years of the contract, and (b) payments for saw timber cut and other timber removed for protective, construction, fuel wood, pulpwood, turpentine, scientific thinning, etc., purposes, measured and computed on a per unit cut basis. They were not required to look to the sale or severance of the timber for the annual payments, and the obligation of Union Bag to make the annual payments, as well as the amount of each payment itself, was in no way determined or affected by the amount of timber cut, or whether any timber was cut at all. It is plain that as to the fixed annual payments the taxpayers did not retain an economic interest in the annual growth, and, consequently, do not qualify for capital gain treatment under Sections 631(b) and 1231.

As to payments received for specified timber measured and computed on a per unit cut basis, the parties apparently recognize that capital gain treatment under Sections 631(b) and 1231 is available to the taxpayers in view of the fact that they have clearly retained an economic interest in this particular timber.

We agree with the taxpayers' claim that regardless of whether or not they retained an economic interest in the timber within Section 631(b), with respect to the fixed annual payments, they were entitled to claim capital gain treatment to the extent of the fair market value of the timber at the time of disposal, under Section 1221 or Section 1231 and Internal Revenue Rulings 62–81 and 62–82.

Those rulings present an analogous situation to what we have here. Revenue Ruling 62–81, which was followed in Revenue Ruling 62–82, involved a contract between an owner of timberland and a paper company regarding all timber growing and to be grown upon a tract for 60 years. The paper company was obligated to pay at a fixed rate per cord, for a designated number of cords of wood per year, or the estimated annual growth, whichever was greater,

---

10. Treas.Reg. § 1.611–1(b) (1).

11. Ibid.

12. See Estate of James M. Lawton v. Commissioner (T.C. 1959), 33 T.C. 47;- Int.Rev.Rul. 62–81.

and was permitted, though not obligated, to cut an amount not to exceed the estimated annual growth. The paper company was required to manage and operate the land with good forestry practices, so that the average annual growth would not be less than the amount of timber cut and removed or otherwise utilized annually. In addition, it assumed payment of the ad valorem taxes, and was given the right to full beneficial possession of the surface to an extent not detrimental to timber growth. The Internal Revenue Service, in ruling that the landowner did not possess a retained economic interest in the timber, and that, therefore, there was no "disposal" thereof under Section 631(b), said that the contract accomplished, instead, an absolute sale of the timber, but limited it to the timber standing at the time of the execution of the contract, since only timber in existence can be the subject of a present sale. It found that payments under the contract equal to the fair market value of timber in existence at the date of the contract constituted proceeds from the sale of timber; that any gain therefrom is capital gain, provided the conditions specified in Sections 1221 or 1231 of the Code are met; that payments not attributable to timber existing at the execution of the contract were not proceeds of sale of timber, but were consideration for the use of the land by the paper company; and that any excess of such payments over the fair market value of the timber existing at the execution of the contract was ordinary income. In this connection, it was pointed out that the landowner had parted with all control of the timber and the land itself, so far as it pertained to the timber growth, and that any growth occurring during the term of the contract was attributable to the possession and management of the property by the paper company.

The primary difference between that contract and the ones now before the Court lies in the seven year noncutting requirement in these contracts. But we do not consider that the inclusion of such a provision in these contracts creates a sufficient dissimilarity to cause them to fall outside the class of transactions the Revenue Rulings were intended to cover. The purpose of the provision was to promote conservation, and it should not be used as a means of penalizing the taxpayers. Actually, none of the contracts considered in the Revenue Rulings, or by us here, required that the annual growth be cut during the first year, or in the year that it took place. The cutting provisions were cumulative and permitted cutting to be performed in any year, restricted to an amount equal to the total annual growth accumulated and uncut up to the date of cutting. Whether the timber in existence at the execution of the contract was cut in the first year or the eighth year is immaterial. The real question under the material facts is whether there was in existence at the execution of the contracts *any* timber having a fair market value. If so, it is entitled to capital gain treatment under the Revenue Rulings, provided, of course, the requirements of Sections 1221 or 1231 are met.

In support of its position that the Revenue Rulings do not apply to this case, the government cites Union Bag-Camp Paper Corporation v. United States (Ct.Cl.1963), 325 F.2d 730, 739. There the Court of Claims considered a number of contracts, including those involved herein, and after quoting language from Revenue Ruling 62–82 to the effect that an allocation of some portion of the lump-sum payments as consideration for a transfer of property in a transaction amounting to a present sale of timber, may be proper, said it did not think such an allocation should be made in a case such as this where the lessee has undertaken to return the leased lands to the lessor with as much, or more, timber standing thereon as existed at the beginning of the lease, because "it does not appear that timber depletion will occur, as such, and thus there is nothing logically to allocate or apportion thereto".

We find, however, that we cannot agree with the conclusions reached by that Court. In the contracts involved in the Revenue Rulings the paper company undertook the obligation to return the lands to the owner with at least *as much* timber standing thereon as existed at the beginning of the leases. For example, in Revenue Ruling 62–81, it was pointed out that "cutting in any year may not exceed the estimated annual growth"; that the "company is required, at its own expense, * * * to manage and operate the land and timber * * * with good forestry practices in such manner that the average annual growth of timber shall not be less than the amount of timber cut and removed or otherwise utilized annually"; and that the company had the right "to the full beneficial possession of the surface to an extent not detrimental to timber growth". The contracts here contained clauses of similar import, with the addition of the seven year noncutting provision, necessitating a return to the owner of the lands with "as much, or more timber standing thereon * *." Inasmuch as timber depletion was not contemplated in either of the contracts construed in the Revenue Rulings, it could not have been a basis for the decision which simply recognized the fact that despite the absence of a provision in the leases relating some portion of the lump-sum payments specifically to timber, if the timber existing on the tract at the execution of the contract possessed a determinable market value, payment to the extent of that value could be apportioned to the sale of the timber. It is no more impractical or unreasonable to make such allocation in this case than it was in the contracts being considered in the Revenue Rulings.[13]

■ The government is correct in saying that the contracts "were ineffective to constitute a sale of timber which came into existence between the execution of the leases and the end of the first seven years". Again, the taxpayers are limited to the fair market value of the timber *actually in existence* at the execution of the contracts. Clearly no timber growth after the date of the contracts would be entitled to capital gain treatment.

Upon a retrial of this case, the Court must determine the character of the timber in the hands of the taxpayers at the date of the execution of the contracts. If it finds that such timber was held for investment purposes more than six months (Section 1221), or was property used in the taxpayers' trade or business more than six months (Section 1231), any gain on the proceeds from the sale of that timber would be entitled to capital gain treatment, and it would then be necessary to ascertain, if this has not already been done, the fair market value of the timber at the time of the execution of the contracts.

The judgment of the district court, insofar as it held that the taxpayers did not retain an economic interest in the timber to which the fixed annual payments applied, is affirmed, but to the extent it held that the taxpayers were not entitled to capital gain treatment on the fair market value of the timber at the time of the execution of the contract, the judgment is reversed, and this cause is remanded for further proceedings not inconsistent herewith.

13. Section 1.631–2(e) (1) of the Treasury Regulations promulgated under the Internal Revenue Code of 1954 allows amounts paid by the lessee for timber or the acquisition of timber cutting rights, whether designated as such or as rental, royalty, or bonus, to be treated as the cost of timber and to constitute part of the lessee's depletable basis of the timber, *irrespective of the treatment accorded such payments in the hands of the lessor.* So we do not consider the Court of Claims' holding that payments made by the lessee were rentals, which should be deductible from gross income, necessarily incompatible with our holding that those same payments in the hands of the lessors, to the extent indicated, are proceeds from the sale of timber and, therefore, entitled to capital gain treatment.