**L. O. CROSBY, Jr., and Dorothy H. Crosby, et al., Plaintiffs-Appellants,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 26907.**

United States Court of Appeals Fifth Circuit.

July 7, 1969.

Rehearing Denied and Rehearing En Banc Denied Aug. 19, 1969.

Bruce C. Aultman, James Simrall, Jr., Hattiesburg, Miss., Robert S. Newton, Paul M. Newton, Gulfport, Miss., for plaintiffs-appellants, Newton & Newton, Gulfport, Miss., Simrall, Aultman & Pope, Hattiesburg, Miss., of counsel.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Mitchell Rogovin, Johnnie M. Walters, Asst. Attys. Gen., Tax Div., Lee A. Jackson, Louis M. Kauder, Attys., Dept. of Justice, Washington, D. C., Robert N. Anderson, Frank X. Grossi, Jr., Attys., Dept. of Justice, Washington, D. C., for defendant-appellee, Joseph E. Brown, Jr., Asst. U. S. Atty., of counsel.

Before COLEMAN and SIMPSON, Circuit Judges, and MEHRTENS, District Judge.

SIMPSON, Circuit Judge:

The taxpayers entered into three identical sixty year Timber Purchase Agreements with St. Regis Paper Company in 1960. During the years 1961–1963, the taxpayers reported the income received from St. Regis pursuant to these agreements as capital gains. The Commissioner held that the income was ordinary and assessed additional taxes which the taxpayers paid. Following denial of a claim for refund, they brought a timely refund suit in the district court below. Sitting without a jury, the court found that the payments were ordinary income.[1] We affirm.

Although the agreement is lengthy and complex, the essential provisions can be briefly stated. St. Regis is required to make payments equal to the average growth of the timber as determined by periodic mandatory estimates. Under this arrangement, the taxpayers are entitled to receive quarter-annual payments based either upon a minimum fee schedule or upon actual average growth if greater. After making these payments, St. Regis is then entitled to cut and remove a prescribed number of cords. Any timber so purchased and paid for, if not cut during the year of

---

1. The district court's opinion and order are found at 292 F.Supp. 314.

payment, becomes a "timber backlog" which St. Regis may cut without making further payments.

## I.

### *The section 631(b) Claim*

 The taxpayers claim that they are entitled to capital gains treatment under Title 26, U.S.C. § 631(b).[2] That section permits a timber owner to treat income received from a contract to sell timber as capital gain if the owner retains an *economic interest* in the timber. Section 1.611–1(b) (1) of the Federal Tax Regulations defines an economic interest as:

> "* * * income derived from the extraction of the mineral or *severance of the timber* to which he (the taxpayer) must look for a return of his capital." (Emphasis added)

Although dealing with a different factual situation, this Court in Dyal v. United States, 5 Cir. 1965, 342 F.2d 248, stated the controlling principle:

> "It is essential that the consideration for the transaction, whether payable in cash or in kind, *be contingent upon severance of the timber* and payable to the owner solely out of the proceeds from the natural resource itself." (Emphasis added)

Consequently if the income generated by these agreements is not contingent upon the severance of the timber, Section 631(b) is not applicable because the taxpayers will have failed to maintain an economic interest in the timber.

Although St. Regis retained a "backlog" right, the Company, under the Agreement, cannot exercise its privilege if current advance payments have not been paid or if the cutting of the backlog would hinder future growth upon which future payments would depend. Significantly, even if these restrictions were met, the agreement does not obligate St. Regis to exercise its backlog privilege. Consequently it is possible for the taxpayers to receive their payments without a single tree ever being cut. This possibility clearly demonstrates that the payments are not contingent upon the severance of the timber. Finally, the contract provides that upon termination all timber not cut and removed remains the property of the taxpayers even if St. Regis had previously made advance payments for the timber.

 The factors mentioned above refute the taxpayers' contention that these advance payments are similar to the advance royalties sanctioned by Section 1.-631–2d(1) of the Regulations.[3] That section extends capital gains treatment to advance payments received in consideration for timber subsequently cut. Here there is simply no guarantee that the timber will ever be cut and thus the regulation is inapplicable. As a result, we conclude that the taxpayers are not entitled to Section 631(b) treatment because the taxpayers did not retain an economic interest which was contingent upon the severance of the timber.

## II.

### *The Section 1221 Claim*

The taxpayers may still receive capital gains treatment if the timber qualifies as a capital asset under Title 26, U.S.C.

---

**2.** Title 26, U.S.C. § 631(b) provides in part:

"In the case of the disposal of timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber, and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber * * *."

**3.** Section 1.631–2d(1) of the Regulations provides in pertinent part:

"[A]mounts received or accrued prior to cutting shall be treated under Section 631(b) as realized from the sale of timber if the contract of disposal provides that *such amounts are to be applied as payment for timber subsequently cut.*" (Emphasis added)

§ 1221.[4] The only dispute with reference to this question is the proper classification of the asset. Section 1221 states that an asset is not capital in nature if it is "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

■■ The determination of this issue is essentially a question of fact, with each case to be decided on its own peculiar facts. See Kirby Lumber Corporation v. Phinney, 5 Cir. 1969, 412 F.2d 598; United States v. Burket, 5 Cir. 1968, 402 F.2d 426; Wood v. C. I. R., 5 Cir. 1960, 276 F.2d 586. Our scope of review then is limited to the determination of whether or not the trial court's findings were "clearly erroneous". F. R.Civ.P. Rule 52(a).

There were three tracts of land sold; Tract No. 1 was held by L. O. Crosby, Jr., individually; Tracts Nos. 2 and 3 were held by Crosby and various members of his immediate family or trusts for their benefit. Tracts Nos. 2 and 3 had originally been owned by the Crosby Forest Products Company, a family owned corporation. The family members purchased the property from the corporation because it was experiencing financial difficulty.

■ L. O. Crosby, Jr., was an experienced timberman. He had engaged in numerous timber related businesses. On several occasions Crosby sold individually owned timber to the family owned corporation. These sales were quite substantial and comprised a significant portion of Crosby's total income. In view of the foregoing, it cannot be said that the trial court was clearly erroneous in determining that Crosby held the timber on Tract No. 1 primarily for sale to customers in the ordinary course of his business and that the timber was not a capital asset.

A more difficult question is presented with reference to the other taxpayers who were members of the Crosby family. These taxpayers had never engaged in any kind of business. Nonetheless, the district court found that the timber on Tracts Nos. 2 and 3 was not a capital asset because it was held primarily for the sale to customers in the ordinary course of business.

■ Since the Commissioner's determination of a taxpayer's status is considered to be prima facie correct, the taxpayer has the burden of proof. cf. Marcello v. C. I. R., 5 Cir. 1967, 380 F. 2d 494; Merritt v. C. I. R., 5 Cir. 1962, 301 F.2d 484; Cefalu v. C. I. R., 5 Cir. 1960, 276 F.2d 122. A careful review of the record reveals that the taxpayers introduced no evidence to indicate that they held the property for investment purposes. All of the evidence points to the conclusion reached by the district court that the sole purpose of the acquisition was to sell the timber to St. Regis.[5] After making this finding, the trial court impliedly attributed the motive, purpose, and intent of L. O. Crosby, Jr., to the other taxpayers.

■ The taxpayers cite United States v. Rosebrook, 9 Cir. 1963, 318 F.2d 316, 319, to support their contention that attribution of L. O. Crosby's intent was improper. The Rosebrook decision is distinguishable. That court found that attribution was improper because the passive co-tenant did not voluntarily participate, acquiesce or have knowledge of the activities of the other co-tenants. In the present case, the taxpayers signed the Buy-Sell Agreement between the corporation and the shareholders and the Timber Purchase Agreements with St.

4. Title 26, U.S.C. § 1221 provides:
 "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer * * * but does not include (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

5. The lands were transferred by the corporation to the individual taxpayers on September 28, 1959. The Timber Purchase Agreements with St. Regis were executed July 2, 1960, a few months after the expiration of the six months required to qualify for long term capital gains treatment.

Regis. There is no evidence that the family involuntarily participated in these activities. Since the evidence indicates no other purpose for the acquisition of the property than the sale to St. Regis, and the taxpayers do not suggest any other purpose, the attribution of the purposes of L. O. Crosby, Jr., to the other taxpayers was proper. cf. Estate of Freeland v. C. I. R., 9 Cir. 1968, 393 F.2d 573, cert. denied 393 U.S. 845, 89 S.Ct. 132, 21 L.Ed.2d 117.

■ The trial court also based its action on an alternative ground, the filing of inconsistent tax returns. In 1961, the Internal Revenue Service inquired as to the taxpayers' 1959 purchases. The Service scrutinized these acquisitions to determine if they were received for a bargain price which would give rise to a constructive dividend. The taxpayers represented to the Service and on their 1959 returns that the pulpwood had no value.

The taxpayers contend that on September 28, 1959, the date of acquisition of the timberlands in question, there was no market for the pulpwood, that the only buyers were hardwood users who had no need for culled pulpwood. They assert that the market was suddenly created on July 2, 1960 when the Crosby family entered into the agreement with St. Regis. Thus they conclude that there is no inconsistency between their 1959 returns which stated the timber had no value and their present attempt to procure capital gains treatment for the income derived from the timber.

The facts indicate that there was a market in 1959. At the very time the family acquired the timberlands, St. Regis was making cruises (surveys) of the timberlands to determine their value. Negotiations between the taxpayers and St. Regis took place before and after the family's purchase. Even Mr. Crosby admitted that he wanted to work something out with St. Regis at the time of the 1959 transfer. Further, Mr. Ernest, a representative of St. Regis Paper Company, wrote a letter dated November 2, 1959, to his supervisor recommending that the company enter into a timber purchase agreement with the Crosbys. Mr. Ernest estimated the total value of the property was $8,350,000.00. The letter recommended that St. Regis enter into a Letter Option Agreement which would provide St. Regis with the opportunity of obtaining the property under its standard Timber Purchase Agreement. The letter reveals that the transaction was not to be consummated until July 2, 1960, because the Crosbys' tax counsel felt the taxpayers could receive capital gains treatment if the property were held six months after purchase.

These facts clearly refute the taxpayer's contention that there was no market for the pulpwood at the time they purchased the timberlands from the corporation. Obviously St. Regis was anxious to procure the pulpwood and it was at the taxpayers' insistence that the transaction was delayed. In view of these circumstances, we agree with the district court's conclusion stated in Crosby v. United States, 292 F.Supp., at 318:

"The taxpayers will not be heard now to say when the statute of limitations has run against any right of the Internal Revenue Service to assay the facts and assess any justly due tax that such information was and is false. A tax advantage simply may not be enjoyed by a taxpayer taking inconsistent positions to earn it." (Footnote omitted)

Finding that the district court was not clearly erroneous in determining that the taxpayers are not entitled to capital gains treatment under either Section 631(b) or Section 1221, we affirm.

Affirmed.

COLEMAN, Circuit Judge (concurring):

I agree that the contract does not obligate St. Regis to exercise its backlog privilege and that the law requires us to take the contract as written. If this were not so I would unhesitatingly hold that these taxpayers are entitled to §

631(b) treatment. I have no idea that St. Regis is spending its money for timber that it will not cut.

Neither am I fully satisfied that the taxpayers other than L. O. Crosby, Jr. should be denied § 1221 treatment. The trouble is that our function is one of review. We cannot reverse findings of fact merely because we might have found differently had we been the first to hear the case. See Kirby Lumber Corporation v. Phinney, 5 Cir., 412 F.2d 598. We can reverse only if findings are clearly erroneous.

I therefore concur in the foregoing opinion.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.