**W. H. PLANT, Jr., and Doris D. Plant,**
**Plaintiffs-Appellants,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 81–7541.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 9, 1982.

Bradley, Arant, Rose & White, Edward M. Selfe, Birmingham, Ala., for plaintiffs-appellants.

Robert T. Duffy, Mary L. Fahey, John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Dept. of Justice, Tax Div., Washington, D. C., for defendant-appellee.

Before GODBOLD, Chief Judge, MER-RITT *, and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge:

In this tax refund suit the appellants seek a capital gain for proceeds received under the terms of a timber sale contract. The district court granted the government's motion for summary judgment, concluding that the decision in *Crosby v. United States*, 414 F.2d 822 (5th Cir. 1969) mandated such a result.[1] We agree with the district court and affirm.

In 1967, the appellants agreed to sell to Hammermill Paper Company (Hammermill) all the timber standing and growing on 2,394 acres of land for a period of twenty years.[2] The agreement provides that Hammermill pay for the timber according to a base price per cord[3] and obligates Hammermill to pay for at least 2,000 cords per year regardless of the actual annual harvest. If Hammermill cuts more than 2,000 cords in any one year, the compensation for the excess is payable at the end of the year. In the event less than the guaranteed minimum is severed, a "timber backlog" clause authorizes Hammermill to harvest the timber paid for in advance at any time prior to the expiration of the contract when the right to cut expires and the taxpayers retain as "liquidated damages" advance payments not credited against the timber yield.[4]

In 1973, 1974 and 1975, the Plants received a total of $47,391.38 in accordance with the terms of the contract and reported the income as capital gains pursuant to 26 U.S.C. § 631(b).[5] When the Internal Revenue Service disallowed this relief, the taxpayers paid additional taxes and filed this suit for a refund.

Section 631(b) provides that income received under a timber sale contract may be regarded as capital gains from a sale of timber if timber which has been held more than twelve months is disposed of by the owner, who must retain an economic interest in the trees. 26 U.S.C. § 631(b).[6] The

---

* Honorable Gilbert S. Merritt, U. S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. The case law of the former Fifth Circuit Court of Appeals has been adopted by the Eleventh Circuit Court of Appeals as binding precedent unless and until overruled or modified by this court sitting *en banc*. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

2. The contract expires on December 31, 1987 with an option to renew for an additional ten years. Record at 39.

3. The price per cord depends on the type of wood and fluctuates according to the change in the Wholesale Price Index for All Commodities.

4. The contract also stipulates that the Plants are required to pay all taxes on the land, including *ad valorem* taxes and improvement assessments. While Hammermill may use the property in any manner necessary to facilitate harvesting, the Plants retain free access for any purpose not inconsistent with Hammermill's rights. The taxpayers retain title in the timber until it is cut so that if the trees become unmerchantable before harvesting, the landowners bear the loss.

5. Although the district court stated in its memorandum opinion that no timber was cut during the years in issue, Record at 60, the record is silent in that respect. As our analysis below indicates, however, this variance makes no difference because the proceeds involved here represent only minimum annual payments. If payments had been made for timber harvested in excess of the 2,000-cord minimum, such income would clearly qualify for capital gains treatment under § 631(b). *See* note 9, *infra*.

6. At the time of the execution of the contract, 26 U.S.C. § 631(b) read, in relevant part:

   In the case of the disposal of timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber.

   In 1976, this section was amended to require that the timber be held for more than one year. "[T]imber ... with respect to which § 631 applies" is referred to in 26 U.S.C. § 1231(b) as "property used in the trade or business." Proceeds from the sale of such property are treated as capital gains by § 1231(a).

sole issue in this appeal is whether the Plants retained an economic interest in the timber in light of the possibility that Hammermill will not harvest all of the trees paid for in advance before the expiration of the contract period, thus entitling the Plants to retain payments for timber not actually severed from the land.[7] If the taxpayers did not retain an economic interest, section 631(b) does not control and the proceeds must be considered as ordinary income.[8]

The tax regulations provide that

[a]n economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in . . . standing timber and secures, by form of legal relationship, income derived from . . . the severance of the timber, to which he must look for a return of his capital.

26 C.F.R. § 1.611–1.[9] In *Dyal v. United States*, 342 F.2d 248 (5th Cir. 1965), the taxpayers sought to qualify for favorable treatment under § 631(b) where the contract specified the payment of fixed amounts annually without regard to the amount of timber cut. The court explained that for taxpayers to retain an economic interest, "[i]t is essential that the consideration for the transaction . . . be contingent upon the severance of the timber, and pay-

able to the owner solely out of the proceeds from the natural resource itself." *Dyal*, 342 F.2d at 252 (footnote omitted). The taxpayers retained no economic interest because

[t]hey were not required to look to the sale or severance of the timber for the annual payments, and the obligation of [the purchaser] to make the annual payments . . . was in no way determined or affected by the amount of timber cut, or whether any timber was cut at all.

*Dyal*, 342 F.2d at 252.

In *Crosby*, 414 F.2d 822, the court elaborated on the *Dyal* rationale in a factual setting very comparable to this controversy. There, the purchaser was obligated to make minimum annual payments which entitled it to cut a prescribed number of cords each year. Timber so purchased but not severed went into a "timber backlog" which the purchaser could cut without making further payments. After reciting the definition of a retained economic interest enunciated in *Dyal*, the court went on to hold that there could be no retained interest unless *all* of the minimum annual payment is *necessarily* contingent upon the severance of the timber:

Significantly, even if these restrictions [on the right to cut the backlog] were

---

**7.** The capital gains treatment for qualifying taxpayers under § 631 and § 1231, *see* note 6, *supra*, was accorded legal force in order to prevent the hardship to taxpayers and the timber industry caused by the necessity of reporting a large amount of ordinary income in the year of harvesting which could not be spread over the years of growth during which time operating expenses continued. *United States v. Brown Wood Preserving Co.*, 275 F.2d 525 (6th Cir. 1960). In 1943, Congress enacted the predecessor to § 631(b) in recognition of the fact that owners who dispose of their timber by means of a cutting contract under which they retain an economic interest should have the same tax advantages as those who sever their own timber. S.Rep.No.627, 78th Cong., 1st Sess. In essence, the Plants seek tax advantages designed to compensate for fluctuating proceeds as well as guaranteed annual income from the sale of timber.

**8.** Title 26 U.S.C. § 1221, which considers proceeds from the sale of a capital asset held for investment purposes as capital gains, affords taxpayers more favorable treatment for earn-

ings up to the fair market value of timber standing at the time of the execution of the contract. *Crosby*, 414 F.2d 822. Timber not standing at the time the agreement was made, however, cannot be a capital asset under § 1221. *Dyal v. United States*, 342 F.2d 248, 252 (5th Cir. 1965). In addition, regardless of whether the sale meets the criteria of § 1231 and § 631(b), the proceeds may still be recognized as capital gains under the general provisions of § 1231 if the timber qualifies as property used in a trade or business. *Dyal*, 342 F.2d at 251, 252. Here, the Plants did not argue to either the district court or this court that their situation fits into either category.

**9.** For example, the Plants clearly retain an economic interest in timber harvested over the 2,000-cord yearly minimum. Since such excess cutting must be compensated for on a price per cord basis, there is no possibility that Hammermill will pay for timber left standing. *See Dyal*, 342 F.2d at 252 (5th Cir. 1965).

met, the agreement does not obligate [the purchaser] to exercise its backlog privilege. Consequently it is possible for the taxpayers to receive their payments without a single tree ever being cut. This possibility clearly demonstrates that the payments are not contingent upon the severance of the timber. Finally, the contract provides that upon termination all timber not cut and removed remains the property of the taxpayers even if [the purchaser] had previously made advance payments for the timber.

*Crosby*, 414 F.2d at 825. The court took note of Title 26 C.F.R. § 1.631–2(d),[10] which extends capital gains treatment of advance payments if the taxpayer retains an economic interest, but rejected its relevance where there is "simply no guarantee that the timber will ever be cut." *Crosby*, 414 F.2d at 825.[11]

We find no real difference between this contract and the one before the *Crosby* court.[12] It is true that the *Crosby* contract contained more significant restrictions on the purchaser's ability to cut its timber backlog. The *Crosby* court made it clear, though, that the mere *possibility* that the backlog would not be cut was the bedrock of its decision. While such a likelihood may be more remote here, it is plainly a part of the contract. The Plants also call attention to the fact that their contract, unlike the *Crosby* agreement, anticipates that the backlog might not be harvested before the expiration of the contract, and thus enables them to retain the prior payments as "liquidated damages for [Hammermill's] failure to cut the timber." Record at 34. The use of these words of art does not alter the fact that both the *Crosby* contract and the Plant agreement permit the landowners to retain the consideration previously paid thereunder at the end of the contract term without obligating them to make a refund for the uncut timber. In reality, it is a guaranteed annual income for the Plants for the life of the contract, precisely the type of arrangement foreclosed by *Crosby*.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

10. Title 26 C.F.R. § 1.631–2(d) provides that

    (1) Where the conditions of paragraph (a) of this section are met [the timber is held for more than one year and the taxpayer retains an economic interest] amounts received or accrued prior to cutting (such as advance royalty payments or minimum royalty payments) shall be treated under section 631(b) as realized from the sale of timber if the contract of disposal provides that such amounts are to be applied as payment for timber subsequently cut . . . .

    (2) However, if the right to cut timber under the contract expires, terminates, or is abandoned before the timber which has been paid for is cut, the taxpayer shall treat payments attributable to the uncut timber as ordinary income and not as received from the sale of timber under section 631(b). Accordingly, the taxpayer shall recompute his tax liability for the taxable year in which such payments were received or accrued. The recomputation shall be made in the form of an amended return where necessary.

11. The Plants point out that, after *Crosby*, it is difficult to conceive of a situation in which the language of subsection 2(d)(2) will have any meaning because that regulation comes into play only when an economic interest is retained and *Crosby* would preclude any such interest in a factual situation covered by 2(d)(2) (the possibility of a non-refundable overpayment). The *Crosby* court obviously did not consider the effect of 2(d)(2) because its applicability is premised on 2(d)(1). The court held that 2(d)(1) governs only advance payments received for timber which the contract *guarantees* will be cut at a subsequent date. Here, as in *Crosby*, there is no such contractual requirement. For that reason, subsection 2(d)(1), and hence 2(d)(2), have no significance.

12. Although the Plants attempt to distinguish *Crosby*, they also take issue with the correctness of the decision, contending that the legislative history of § 631(b) refutes its rationale. The term "retained economic interest" first appeared in cases in which the issue was whether the taxpayers received the proceeds from the outright sale of oil and gas or if the income was the result of a disposition by which there was a retained economic interest in the minerals. While the Plants admit that the tax consequences in the oil and gas area are different (a taxpayer with a retained economic interest in oil and gas receives ordinary income, 26 U.S.C. § 611), they maintain that since a guaranteed income does not defeat a retained interest in oil and gas, *Burnet v. Harmel*, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed.2d 199 (1932), Congress intended a similar result when it used the phrase with respect to timber. As stated earlier, we are bound by *Crosby. See* note 1, *supra.*

MERRITT, Circuit Judge, dissenting:

It seems to me that 26 C.F.R. § 1.631–2(d), quoted in footnote 10 of the Court's opinion, is applicable to the timber contract in question here. Thus, the "amounts received [by the taxpayer] prior to cutting" under subsection 2(d)(1) should be treated as capital gains subject to recomputation as ordinary income under subsection 2(d)(2) if the contract ends "before the timber which has been paid for is cut." The *Crosby* case relied upon by the court did not specifically consider and analyze subsection 2(d)(2), and I would distinguish it on the ground that the taxpayer in *Crosby* did not bring to the court's attention the recomputation feature of the regulation, a feature that clearly contemplates that all the timber paid for may not be cut. The court in *Crosby* was, therefore, led to believe that the statute and regulation in question contemplate as a decisive test of capital gains treatment the cutting of all the timber. Subsection 2(d)(2) cannot be reconciled with such an interpretation. The *Crosby* court did not reach a considered decision based on an analysis of all the law applicable to the facts, namely subsection 2(d)(2). The *Crosby* case should be distinguished because the court there did not consider the main argument concerning the applicability of subsection 2(d)(2) presented by the taxpayer here.