PERCY E. GODBOLD, JR., AND GRACE F. GODBOLD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18123–80.    Filed January 9, 1984.

Percy E. Godbold, pro se.
*Jillena A. Warner,* for the respondent.

SHIELDS, *Judge*: Respondent determined deficiencies in petitioners' income tax for 1978 and 1979 in the respective amounts of $16,086.83 and $1,488.37. After concessions by the parties, the issue remaining for decision is whether certain payments received by petitioners under a long-term contract for the sale of timber must be treated as ordinary income as contended by the respondent, or as income from capital gains under section 631(b)[1] or section 1221, as contended by the petitioners.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference.

Petitioners Percy E. Godbold, Jr., and Grace F. Godbold, husband and wife, resided in Anniston, Ala., when the petition was filed in this case. They filed joint income tax returns for 1978 and 1979 with the Internal Revenue Service Center in Chamblee, Ga.

Mr. Godbold is a banker and certified public accountant. Mrs. Godbold is a housewife. On April 8, 1966, Mrs. Godbold had owned for several years a tract of land containing 652 acres of which 640 acres constituted timberland. Neither Mr.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.

Godbold nor Mrs. Godbold was in the business of selling or harvesting timber, and the timber standing on the property was not used by them in a trade or business or held for sale in the course of any business.

On April 8, 1966, petitioners, as owners, executed a Timber Sale and Purchase Contract with Harmac Alabama, Inc., as purchaser. The name of the purchaser was later changed to MacMillan Bloedel Products, Inc., and will be referred to herein as MacMillan Bloedel, the purchaser or the corporation. The contract covered timber standing on, or to be grown on, the aforesaid 640 acres of timberland. The contract was effective through December 31, 2028, a period of 62 years.

Under the contract, MacMillan Bloedel received the exclusive right to cut and remove all timber standing and growing at the time of the contract and all future timber standing and growing during the term of the contract, except for the equivalent of 1,280 cords of pulpwood timber which the petitioners reserved the right to cut and remove on or before January 1, 1968. MacMillan Bloedel was obligated to pay the petitioners for pulpwood timber, and certain hardwood timber at a specified rate of $6 per cord as adjusted in each year in which there was a fluctuation of 5 percent or more in the annual average of the Wholesale Price Index for All Commodities over the annual average of such index for 1964. MacMillan Bloedel was also obligated to pay the petitioners for any removal of merchantable saw, pole, piling, crosstie, or veneer block timber according to the stumpage price prevailing from time to time in the vicinity.

The contract required MacMillan Bloedel to maintain a "cord credit account" which was to be credited each year for 640 cords of merchantable pine pulpwood timber. The account was to be debited for each cord of merchantable pine pulpwood timber, or its equivalent, as it was cut and removed from the land. The corporation, however, was under no obligation to cut any quantity of timber in any year, but was required to pay the petitioners in equal quarterly installments an amount equal to the purchase price of 640 cords of merchantable pine pulpwood timber, whether or not any timber was cut during that year.

If MacMillan Bloedel cut timber in any one year in excess of the total cord credit, resulting in a debit balance in the cord

credit account, the corporation was to pay the petitioners the purchase price for the overcut of timber in the following year. Any credit balance in the account was to be carried forward each year as a credit against any timber cut during subsequent years, but any such credit would not reduce the corporation's obligation to pay the petitioners the minimum amount each year equal to the purchase price of 640 cords.

Upon termination of the contract, the petitioners were entitled to retain as liquidated damages all minimum payments they had received, whether or not MacMillan Bloedel ever cut the timber for which such payments were made.

On May 23, 1966, the petitioners sold to MacMillan Bloedel the 1,280 cords of pulpwood timber that had been reserved in the original contract between the parties. The petitioners received $7,680 for this timber, payable in two equal amounts of $3,840 in 1966 and 1967. By agreement, these 1,280 cords of pine pulpwood timber were credited to the cord credit account, but the payments did not eliminate the corporation's obligation to make the minimum quarterly installments for 1966 and 1967 as prescribed in the agreement of April 8, 1966.

The entries made in the cord credit account maintained by MacMillan Bloedel for the years 1966 through 1979 pursuant to the timber sale and purchase contract were as shown on page 77.

MacMillan Bloedel cut no timber under the contract in 1966 through 1971, or in 1974, 1978, and 1979. Timber was cut in 1972 and 1973, and in 1975 through 1977. Until 1977, the cut timber did not exceed the credit balance in the cord account. In 1977, MacMillan Bloedel overcut the timber by 6,437 cords, and, pursuant to the contract, paid petitioners $71,197.53 in 1978 for the overcut.

The fair market value on April 8, 1966, of the timber on the land covered by the contract was $68,817.34. From and after their receipt of the payment in 1978 for the overcut in 1977, the petitioners had completely recovered the value of the timber on the date of the contract.

Title to the timber covered by the contract remained in petitioners until the timber was cut. Until such time, they were also responsible for all taxes levied against the property including the standing timber, and they bore the risk of any

| Year | Cord credit | Price per cord for credit | Cord (debit) | Price per cord for debit | Cord balance | Payments received by petitioners |
|---|---|---|---|---|---|---|
| 1966 | 640.00 | $6.00 | | | 640.00 | $3,840.00 |
| 1967 | 640.00 | 6.00 | | | 1,280.00 | 3,840.00 |
| 1968 | 640.00 | 6.17 | | | 1,920.00 | 3,945.60 |
| 1969 | 640.00 | 6.33 | | | 2,560.00 | 4,051.20 |
| 1970 | 640.00 | 6.54 | | | 3,200.00 | 4,182.40 |
| 1971 | 640.00 | 6.95 | | | 3,840.00 | 4,444.80 |
| 1972 | 640.00 | 7.21 | (1,490.86) | $7.21 | 2,989.14 | 4,614.40 |
| 1973 | 640.00 | 7.21 | (1,688.35) | 7.21 | 1,940.79 | 4,614.40 |
| 1974 | 640.00 | 8.52 | | | 2,580.79 | 5,452.80 |
| 1975 | 640.00 | 10.12 | (2,033.14) | 10.12 | 1,187.65 | 6,476.80 |
| 1976 | 640.00 | 11.06 | (285.45) | 11.06 | 1,542.20 | 7,078.40 |
| 1977 | 640.00 | 11.06 | (8,619.59) | 11.06 | (6,437.39) | 7,078.40 |
| | 6,437.39 | | (additional payment for debit balance) | | 0 | 71,197.53 |
| 1978 | 640.00 | 12.28 | | | 640.00 | 7,859.20 |
| 1979 | 640.00 | 13.24 | | | 1,280.00 | 8,473.60 |
| | | | | | | 147,149.53 |

damage to the timber caused by fire, weather, disease, or insects.

On their returns for 1966 through 1979, the petitioners reported all payments received under the timber contract as income from capital gains. The respondent did not question this treatment on any of the returns for 1966 through 1977, but in the deficiency notice for 1978 and 1979, he determined that $69,858.59 of the $79,056.73 received by the petitioners from MacMillan Bloedel in 1978 and all of the $8,473.60 they received from the corporation in 1979 were ordinary income and not income from capital gains.

The respondent has subsequently conceded that all of the $71,197.53 received by the petitioners in 1978 for the overcut made in 1977 was properly reported by them as capital gain income. He continues to insist, however, that the minimum payments totaling $7,859.20 in 1978 and $8,473.60 in 1979 are ordinary income.

On their part, the petitioners concede that 75 percent of the minimum payments for 1978 and 1979 do not qualify for capital gain treatment under section 631(b). They have made this concession because by December 31, 1977, 480 acres, or 75 percent, of the timberland covered by the contract had been substantially clear cut and replanted.

They continue to insist, however, that the other 25 percent of such payments qualifies for capital gain treatment under either section 631(b) or, in the alternative, under section 1221.

## OPINION

Under section 631(b) as it existed in 1966, income received from a timber sale was treated as capital gains if the timber had been held for more than 6 months (12 months after 1976), was disposed of by the owner, and the disposition was in such a manner that the owner retained an economic interest in the timber.[2]

---

[2]At the time of the execution of the contract, sec. 631(b) provided in relevant part:

"In the case of the disposal of timber held for more than six months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber."

This provision was designed to give an owner of timber who sells it under a cutting contract the same favorable capital gains treatment as an owner who sells it outright. See S. Rept. 627, 78th Cong., 1st Sess. (1943), 1944–1 C.B. 973, 993, which deals with sec. 117(k)(2) of the 1939 Code, the predecessor of sec. 631(b). See also *Indian Creek Lumber Co. & Consolidated Subsidiaries v. Commissioner*, T.C. Memo. 1982–146.

The applicable regulation describes an economic interest as one "in which the taxpayer has acquired by investment any interest in * * * standing timber and secures, by any form of legal relationship, income derived from the * * * severance of the timber, to which he must look for a return of his capital." Sec. 1.611–1(b)(1), Income Tax Regs. This regulation was considered with approval by the Fifth Circuit in *Dyal v. United States*, 342 F.2d 248, 252 (5th Cir. 1965), revg. and remanding an unreported case (S.D. Ga. 1963, 64–1 USTC par. 9196), in which it stated at page 252:

It is essential that the consideration for the transaction, whether payable in cash or in kind, be contingent upon the severance of the timber, and payable to the owner solely out of the proceeds from the natural resource itself.

The Court concluded that capital gains treatment under section 631(b) was not available to the taxpayers in *Dyal* because "They were not required to look to the sale or severance of the timber for the annual payments, and the obligation of [the purchaser] to make the annual payments * * * was in no way determined or affected by the amount of timber cut, or whether any timber was cut at all." *Dyal v. United States, supra* at 252.

Again, in *Crosby v. United States*, 414 F.2d 822 (5th Cir. 1969), affg. 292 F. Supp. 314 (S.D. Miss. 1968), the Fifth Circuit applied the economic interest rationale of *Dyal* by holding that there could be no retained interest unless the minimum annual payment was contingent upon the severance of timber. In *Crosby*, the purchaser made minimum annual payments which entitled it to cut a prescribed number of cords every year. The timber which was purchased but was not severed went into a "timber backlog" which the purchaser could cut

In 1976, this section was amended to require that the timber be held for more than 1 year. Pub. L. 94–455, 90 Stat. 1732.

without making further payments. Nothing in the agreement required the purchaser to exercise his backlog privilege. Consequently, the taxpayers might have received their payments without a single tree's being cut and, consequently, the payments were not contingent upon the severance of the timber.

Finally, in *Plant v. United States*, 682 F.2d 914 (11th Cir. 1982), affg. an unreported case (N.D. Ala. 1981, 48 AFTR 2d 81–5936, 81–2 USTC par. 9661), the taxpayer sold to a paper company all the timber standing and growing on certain acreage for a period of 20 years. The paper company was obligated to pay for at least 2,000 cords per year regardless of the annual harvest. If the company cut more than 2,000 cords in any one year, the taxpayers were compensated for the excess at the end of the year. If fewer than 2,000 cords were severed, a timber backlog clause authorized the company to harvest the timber at any time prior to the expiration of the contract. At the termination of the contract, the taxpayers were to retain as liquidated damages any advance payments not credited against the timber yield.

The taxpayers in *Plant*, like the petitioners herein, were required to pay all the taxes on the land and the timber until cut. Also, the taxpayers retained title in the timber until it was severed, so that if the trees became unmerchantable before harvesting, the taxpayers bore the loss. Relying on *Crosby* and *Dyal*, the Eleventh Circuit in *Plant* denied capital gains treatment under section 631(b) for the minimum annual payments. The Court characterized the liquidated damages clause in the contract as words of art, which did not alter the fact that the landowners could retain all payments previously made without any obligation to refund amounts for uncut timber. "In reality, it is a guaranteed annual income for the [taxpayers] for the life of the contract, precisely the type of arrangement foreclosed by *Crosby*." 682 F.2d at 917.

The contract at issue in the *Plant* case is indistinguishable from the contract under consideration here. Petitioners were guaranteed annual payments based on 640 cords of timber per year, whether or not any timber was ever severed. Petitioners' cord account was credited in years during which no timber was cut and then debited during the 5 years in which timber was severed. Petitioners bore the risk of loss from damage or

destruction of the standing timber and retained title in the wood until it was cut. They also paid all the taxes on the timber and the land. A liquidated damages clause provided that petitioners could retain any amount paid in advance for uncut timber at the expiration of the contract.

Petitioners argue, however, that under section 1.631–2(d), Income Tax Regs., they are entitled to capital gains treatment on the annual payments.[3] This section provides that advance payments may receive capital gains treatment if the taxpayer retains an economic interest in the timber and the payments are to be applied to timber subsequently cut. This section is inapplicable where there is no assurance that any timber will ever be cut. *Crosby v. United States, supra* at 825.

In view of the foregoing, we conclude that petitioners are not entitled to the benefits of section 631(b) because they did not retain an economic interest which was contingent upon the severance of the timber.

Even though petitioners did not retain an economic interest in the timber which would entitle them to capital gains treatment under section 631(b), they are entitled to capital gain on the payments received for the timber which qualifies as a capital asset under section 1221. As stated in our findings, the respondent has conceded that the petitioners are entitled to capital gains treatment to the extent of the value of the timber in existence on the date of the sale. This concession is in line with Revenue Ruling 62–81, 1962–1 C.B. 153, which involved a contract for the sale of timber standing and growing for a period of 60 years. The paper company was obligated to pay a fixed rate per cord for a designated number of cords of wood per year, or the estimated annual growth, whichever was greater. In the ruling, respondent concluded that the contract

---

[3]Sec. 1.631–2(d), Income Tax Regs., provides in relevant part:

(1) Where the conditions of paragraph (a) of this section are met [the timber is held for more than 1 year and the taxpayer retains an economic interest], amounts received or accrued prior to cutting (such as advance royalty payments or minimum royalty payments) shall be treated under section 631(b) as realized from the sale of timber if the contract of disposal provides that such amounts are to be applied as payment for timber subsequently cut.* * *

(2) However, if the right to cut timber under the contract expires, terminates, or is abandoned before the timber which has been paid for is cut, the taxpayer shall treat payments attributable to the uncut timber as ordinary income and not as received from the sale of timber under section 631(b). Accordingly, the taxpayer shall recompute his tax liability for the taxable year in which such payments were received or accrued. The recomputation shall be made in the form of an amended return where necessary.

accomplished an absolute sale of the timber standing at the time of the execution of the contract, and that payments equal to the fair market value of timber existing at that date constituted proceeds from the sale of timber which were treated as capital gains under section 1221 or section 1231. However, the respondent also concluded that because only timber in existence can be the subject of a present sale, the payments not attributable to timber existing at the execution of the contract were not proceeds from the sale of timber, but instead were consideration for the use of the land by the paper company and were taxable as ordinary income. See *Estate of Lawton v. Commissioner*, 33 T.C. 47 (1959).[4] The reasoning set forth in Revenue Ruling 62–81 was adopted by the Fifth Circuit in *Dyal v. United States, supra*,[5] as follows:

the taxpayers are limited to the fair market value of the timber *actually in existence* at the execution of the [contract]. Clearly no timber growth after the date of the [contract] would be entitled to capital gain treatment. [342 F.2d at 254.]

Therefore, all payments received under the contract by the petitioners for the timber which was in existence on April 8, 1966, qualify for capital gains treatment under section 1221 as being amounts received from the sale of a capital asset. Unfortunately, the petitioners will derive no further benefit from this conclusion because we have found that after receipt of the payment in 1978 for the overcut in 1977, the petitioners had fully recovered and had been allowed capital gains treatment on the value of the timber in existence at the execution of the contract. As a result, the minimum payments of $7,859.20 in 1978 and $8,473.60 in 1979 are taxable to them as ordinary income.[6] *Dyal v. United States, supra.*

*Decision will be entered under Rule 155.*

---

[4] See also *Bridges v. Commissioner*, T.C. Memo. 1979–290 (payments in excess of market value of timber when contract executed treated as ordinary income).

[5] An appeal from the decision in this case would be to the newly created Eleventh Circuit. However, the case law of the former Fifth Circuit has been adopted by the Eleventh Circuit as binding precedent unless or until overruled by the Eleventh Circuit Court of Appeals sitting en banc. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981). See *Simon v. Commissioner*, T.C. Memo. 1982–2 (43 T.C.M. 269, 271, 51 P-H Memo T.C. par. 82,008); *DiAndrea, Inc. v. Commissioner*, T.C. Memo. 1983–768 (slip op. at 13 n. 15).

[6] Petitioners' reliance on *Ah Pah Redwood Co. v. Commissioner*, 251 F.2d 163 (9th Cir. 1957), revg. on other grounds 26 T.C. 1197 (1956), is misplaced. There, the Ninth Circuit denied capital

---

gains treatment to payments received under a contract for the sale of timber pursuant to sec.
631(b). Acknowledging that capital gains treatment might be available under the predecessor to
sec. 1221, the Court of Appeals remanded the case to the Tax Court to determine the purpose for
which the property was being held by the taxpayer, whether primarily for sale to customers in the
ordinary course of trade or business or as an investment. Whether the payments made to the
taxpayer exceeded the fair market value of the timber standing at the time the contract was
executed was not an issue in that case.